We will next hear argument in the case of Global Master v. Esmond. Mr. Deliberty, please proceed.  I am Richard Deliberty for the Global Master plaintiffs and appellants. In this case, the defendants refused to produce key documents, spoken-gun documents, in the case. They skipped depositions. They sought extensions, then missed the extended deadlines. Those choices had effects throughout the case. First, Global Master sought an extension of time so we could try to get the documents and try to get the depositions. The judge held that there was no good cause for the extension. Now, in that case, the case schedule is meant to bind both parties. This court, in the case of Jorgensen v. Cassidy, pointed out that when parties serve inadequate discovery responses and serve responses late so that the discovery cutoffs can't be met, that violates the case schedule. Okay, Mr. Deliberty, I guess I'm just a little curious as to why you did not begin serving discovery requests on defendant appellees until October of 2021. Why did you wait so long to start doing discovery? Well, I happen to be trial counsel, so I can speak to that. So you were trial counsel? Yes. I don't think the record reflects that, but I'm happy to address it. The fact that the record doesn't address it is why I didn't address it in the briefs. The answer is that the defendants were serving discovery. We were responding to their discovery. We expected our discovery to be limited. The requests that we served, I think we had three interrogatories, 25 document requests. We had a lot of evidence already. So we didn't anticipate that our affirmative discovery was going to be taking a long time, and honestly, we were focused on responding to defendants' discovery. But you don't disagree that at the end of the day, the request that was ultimately denied was filed after the close of discovery, correct? So there was, yes. I mean, there were prior requests. Some were denied. One was denied. One was partially granted. But then when you finally came back in and said, hey, we need more time, that was five days after discovery had closed. Right, the third of the three extension requests. Right. I guess that's the question. I mean, would this case be different if that were filed before discovery? It's hard to say. For us to issue a rule that says the district court abused its discretion, it's one thing not to grant an extension when discovery is still open, but after discovery closes, do we want to set down a rule that says, well, it's an abuse of discretion if you don't allow it to go on after that? Right. So, I mean, this was a train wreck that was coming for a while. And we served discovery requests at the beginning of October. There were several months left until the end of discovery. We got sham responses on November 16th, which is something that the district court pointed to. We made a joint request for an extension at that time, just four days later, contrary to what the district court says in its opinion. We were dealing with these issues with depositions, which were insane and took all of our focus to try to figure out how to get these depositions taken when our witnesses were in China during the pandemic and couldn't travel. So we asked for more time. The court gave us, you know, because the other extension had been denied, we didn't seek a very aggressive extension, and the court still shorted us on that extension. I mean, we weren't given the impression that an extension was going to be forthcoming, even though we had a great need for it. You know, it's interesting about this case, with the exception of the domestic injury issue, which I want to get to in a minute. As you well know, when you're talking about discovery, particularly when dealing with international bodies, there's a lot of give and take. And the reality is that district judges are just kind of like referees. They try to make it work the best they can, and I find it really difficult to find out why this judge wasn't acting perfectly reasonably. Now, you disagree with that, I understand, but as my colleague points out, the reality is that sometimes one party was acting a little bit late, others a different time. But the fact is, how do we find this was an abuse of discretion? I mean, we've had all kinds of claims, but how can we put down a fast rule to show that this is an abuse of discretion? Right. Well, I'm not sure the court does have to put down a fast rule. I mean, there are a lot of facts in this case. Some of them are pretty egregious. The defendants just skip that decision. But the reality is, for better or for worse, when we decide a case, sometimes even when we're not publishing them, we just have memorandum dispositions, people still cite them. And they say, you said in this case this, this, this, and this. So we have to be careful what we say. I agree. And I struggle with how this case rises to the kind of judicial abuse, if there was any, that warrants a change in the rules. I don't see it. What am I missing? Yeah. So if I may, this court has done that already. This court said in Noyes v. Kelly on facts that I find indistinguishable. In fact, I think this case the facts are much worse on very similar facts.  I wasn't clear when I tried to go back and look at that case. I'm afraid to say definitively. My memory was that things in that case happened after discovery closed. There were certainly depositions that happened after discovery closed, which is part of what's so similar to this case. If I remember correctly, it was like two weeks or four weeks before the close of discovery that depositions were scheduled that weren't able to be taken and then those were ultimately rescheduled until just after the and they were taken, I believe, in Noyes, just after the close of discovery. So I know that the deposition took place later. I don't know for sure whether the request for extension took place later. For the post-discovery depositions that were taken, were they done by agreement of the parties or done pursuant to some kind of discovery order? Two categories. My sense is it's not super clear from the record. I think it was by agreement of the parties in Noyes. That's part of the problem where I wonder how much weight we can put on Noyes because the record does seem unclear and the analysis seems, I mean, I don't know what to make of the analysis in Noyes. So I understand you're pointing to Noyes, but you're asking for a lot of weight on that case. Can I turn to domestic injury? I mean, the problem I have with the domestic injury here is the products that were allegedly, I guess, altered or misrepresented or whatever the term is, they were never planned to be sold in the U.S., inspected in the U.S. Is there any action that happened in the U.S. other than the FOB Los Angeles Clause that you're pointing to to show that this was a domestic injury? Right. So the FOB Los Angeles Clause is the main thing that we have. I mean, this is the seller. The seller was in? Is a California company. All the operations are in California. Global Master China is a Chinese company. The principal of the company is a U.S. California citizen. And so a lot was happening in California. And because the discovery was so truncated, we didn't get a chance to explore a lot of that, and so there's not a lot in the record. But I think this is a really simple case. Well, on one term it is. I mean, I'm intrigued by your argument, but I'm concerned about how we would craft this in a way. I mean, maybe it's just as simple as look at the property. Your position seems to be you owned that property at the time it came into the Los Angeles port. Is that correct? Absolutely. I think very clearly. But how long did it stay? I mean, help me out. Did you own it for 15 minutes while it was in the U.S., before it went out? I mean, was it? I don't know, and I don't think it matters. I think if we took delivery of California for one second, we have property that was in California, our injury was in California, and that's the end of the analysis. I think that's clearly what the Second Circuit in Baskinian would say. If it's tangible property, it's an easy case. Was it in the U.S.? If so, then you have domestic injury. And this court in its recent decision, Spagan, I guess your point would be that's the same thing as me sending over an employee from China. He walks into a business in California, buys it, takes it back, and then finds out. Then he goes back to China. He finds out it's altered. He would say, no, that's the same thing. We had possession of it when I bought it in that store in Los Angeles. Even though I wasn't planning to sell it or distribute it there, you would use that as an analogy? That's very similar. I think another fact of this case is the whole business model of this company is we trust American products. So they're shopping in America for the goods that they're going to sell in China so that they can go to China and say— Yeah, but that doesn't really control it because if the FOB clause had said China or say somehow the boat stopped in Singapore and the FOB says Singapore, you wouldn't have a case. So it really isn't the fact that you were planning to buy American products. I mean, as I understand it, the question is a technical one about when the title changed hands. Right. Well, I think the technical question makes it easy. I think because the title changed hands in California, we don't have to think about a lot else. You would have to say that your allegation is that it was harmed when it changed hands there. What if these were probiotics that were very fine when they came into the Los Angeles port, but it turns out the shipment was delayed for four months, and so as a result the probiotics were worthless once they got to China? Would that be a different case because the product was not adulterated? The harm didn't occur until outside of the United States. Would that be a different case? Right. I mean, I think it depends on what the nature of the harm was. It sounds like you're suggesting in that case there is no fraud. Maybe there was negligence that led to the delay of the shipment. And under the kind of analysis that the Third Circuit did in Humphreys, I think you'd want to look at a lot of different things. You would want to look at where the decisions were made that led to the delay. Maybe who was in control of the ship. I think there would be a lot of things. The point, I think, and I believe in Spagan this Court is moving in that direction, we aren't going to just look at one thing necessarily. If it's tangible property, it's in the U.S., then it's an easy case. But if you're not going to treat this as tangible property, then it's a complicated analysis. And one of the factors that the Court in Humphreys looked at and that this Court in Spagan talked about is that all of the conduct that led to the harm happened in the U.S. And that is a valid factor. If you look at the – I want to leave a little bit of time. If you look at the Supreme Court's decision in Arturo Nabisco, you'll see that the Court was very focused on the issue of foreign conduct. When does U.S. law – when can U.S. law govern foreign conduct? Well, in a case like this, there's no question of that. And so it's not even clear why we need to get to this next step of analysis of, well, we only have extraterritorial effect if there's domestic injury. So you – well, you need time for rebuttal. But one last question. If the FOB clause were China, you seem to be saying you'd still be making this argument, that the harm, all the actions that caused the product to become defective, in your view, occurred in the United States. So you'd still say it was domestic, even in that circumstance? I would. I'd say it was a harder case, but I would be arguing yes. All right. Very well. Thank you, Your Honors. All right. Mr. Quintana. Good morning, Your Honors. I, too, was trial counsel, and I have just a few questions. You two are good friends, no doubt. Oh, we're – actually, we get along really well. We all get along pretty well. We're advocates. We're advocates and civil, and that's – I have a pleasure working with Mr. Deliberty. Parkway Grill's a great place. We actually talk about our kids, and we have a good relationship, and so that's important. So if your relationship's so good, why didn't you just agree to some of this discovery that you knew how troubling this had been? Why didn't you just agree, okay, let's get this done? We did voluntarily produce discovery. Let me explain. One of the key issues here, Your Honor, which we preserved many times, and we stated several times to the trial court. We briefed. It's not really a part of this particular issue because we prevailed. Had we not prevailed, we would have raised this issue, and that is who is the plaintiff? Because they're saying Global Master China. I mean, it's Global Master Company, Global Master Corporation, and our position from the beginning. We told the court as part of our motion to dismiss the case in the second time, we would have never done business with a company called Global Master China or Global Master Company. We informed counsel. We briefed the issue. We found out that there was a company called Global Master trading something in China, and we talked to the legal representative of that company who was going to testify at trial. The fact is, so let me just say, we did do business with Global Master. Who's the contract that included the FOB Los Angeles clause with? That is some other company that, well, there's a document that they produced that was attached to a declaration, Mr. Deliberty. I believe it wasn't Global Master Company, Global Master China. It was a company. I don't remember the name, Your Honor, but it didn't have the word Global Master in it. And so the question here is we've never done business with that company. Now, we did do business with the California entity, Global Master. Let me be sure I'm understanding your argument here. In response to my colleague's question, he wanted to know who was the FOB, for whose benefit was that, and you're claiming that's a different company than the one you did business with, right? We're saying that it's different than the plaintiff. The plaintiff here, and the reason I'm trying to explain why I just didn't turn over the documents, and the reason was the problem was we responded to discovery. We didn't do business with a company called Global Master China, Global Master Company. We did do business with Global Master International Group, Inc. They didn't propound any discovery. Nonetheless, we provided documentation. In rejecting GMC's RICO claim, the district court didn't go down this route. What the district court said was the injuries were felt in China, and therefore it wasn't a domestic injury. Absolutely, Your Honor. You're saying there's an alternative grounds to affirm that because I don't, I guess I don't, because the product was never actually owned in the United States by the plaintiffs. That's correct. And the reason I— What document can I go to to flesh that out? Well, I think you can go to the FOB itself. I was looking for that. It's attached to our volume to, I don't know the specific name, but it was an exhibit to the Deliberty Declaration. Okay. But furthermore, and the reason I even brought this up, Your Honor, was that the response was your question of why didn't you turn over the documents. Well, what documents am I turning over when we haven't done business with you? But to the extent— Well, no, I understand how we got here. I'm now interested in the fact that we're here because this to me is the interesting part of this case, is this domestic injury. It's never really been decided. The district court has one plausible theory. It's a legal question. Now, you're throwing in some factual issues that I guess we'll have to— I hadn't walked down this line. But this is the impact of this case, that whether this is a domestic injury or not, this was decided on summary judgment by the district court, and the question is should the Ninth Circuit adopt where the injury was felt or where the injury occurred. I mean, I'm not even sure if it's where the injury occurred. And so I think there's even a preliminary question, Your Honor, and that is that I think it gets conflated a little bit because of the nature of the product we're talking about, and that is was this a tangible product? Who claimed it was a tangible product? Well, not necessarily because what they got was they asked for a certain supplement. They didn't get, now, the formulations, an issue with the formulation. So they got a product from us that they're claiming was not conforming. Why isn't that a tangible product? Well, it's tantamount to saying, I believe— You're saying that it's the formulation that's the problem, not the product itself? Right, but the product, they got vitamin C, for instance. Now, they wanted 1,000 milligrams. But they're saying that the vitamin C itself is not up to standards. No, they're saying that we didn't get the same amount of, let's say we want 1,000 milligrams. In other words, first of all, there's no problem. They got the vitamin C. It wasn't with a bunch of other issues. It wasn't a product defect issue. They're claiming it wasn't what was represented to them. And so what they're saying is, for instance, you go, Your Honor, you go buy a four-wheel drive at Toyota. And instead of getting a four-wheel drive, you buy it, you take it off a lot. And then you say, well, actually, it's not a four-wheel drive. Well, nonconforming. But tell me how that's not a tangible product. I don't understand that question. They're saying that—let's go to their response. In other words, don't take my word for it. Go to what they said, because I asked that question in discovery, and it's in our brief. And I'll cite to it right now. What they say very specifically, and this is Volume 2, S.E.R. at 401, 477, and 521. I asked a very basic interrogation. State the business or property that had been injured. And they said, well, there's three things. They didn't identify the product itself. What they said was, one, they said it was essentially a diminution in value, that the value of the inferior supplements that are received— I'm looking at Volume 2, S.E.R. 401, and it looks like it's— Well, look at 477 and 521. It's also in our brief, Your Honor. I restated the actual interrogatories as well. And it is on page 32 of our brief. Help me out on 477. What are you looking at? Well, there's a question of whether or not this is the issue related to the interrogatory response. Interrogatory response 3. Number 2? Interrogatory response 3, Your Honor. Okay. And the issue here is— Where's that 470? S.E.R. 478. 478? Okay. Thank you, Your Honor. And so the question here is, they say there's three things. One is the diminution in value, that the value of the inferior products, okay? Not the product itself. It's the value of the inferior product. Okay. I get your argument. But that's an intangible. I don't buy it. No, no, no, no. It's not intangible. You're saying we bought a tangible product that is of less value than another product. I mean, there's two things— But the value, the harm is what they're saying. Okay. Fair enough. But let's assume I don't agree with you on that. Okay. Do you disagree that the FOB Los Angeles clause means that title transferred in Los Angeles, that they owned the property in Los Angeles? Okay. I'm not going to— We explained what that meant with respect to my client. Look, I don't really care what your client thought it meant. My question is, legally, I understand that this was a way of allocating— who takes the responsibility for the damages. So your client is saying, we're washing our hands of this. It's in LA. We're done. You've got—I understand that's why you enter into it. But the question is, what is the practical impact of that? Okay. And it seems like the practical impact of that is that this is now product that GMC— or, okay, we'll put that aside. You're saying it might be someone else—owns in the United States, in Los Angeles, that they claim is defective. What's wrong with that analysis? Okay. Well, a couple things. Number one is that that alone isn't enough to overcome the Supreme Court case of having a presumption of non-exterritorial use or application of law. In other words, FOB is done all the time. Now, to the extent that, for instance, let's go to the— The Supreme Court hasn't addressed FOBs. Okay. Right. But let's see if I can play this with an analogy. Using the second circuit case, Buscanyan. And when Buscanyan says that, look, I understand that we have some of the— there are things in the JP Morgan account, right? There's money. We know it's there. JP Morgan account. But we know that, look, using banks is part of what we do every day. Part of commerce is using banks. But we know it's—we know physically it's there. But that's not enough. Using that bank alone isn't enough. Having an account isn't enough. And so the question here is, well, I would make the argument, and there isn't an FOB case, but I would make the argument that using shipping, the same way that commerce is done by banks, using shipping every day from the ports in Los Angeles, around the world, is just—is kind of like using a bank in order to move money as part of— it's a necessary evil. And if this court were to say, well, now, FOB triggers a domestic injury, it would upset the shipping— It would upset the interests of how all of a sudden no one would want to have FOB in the United States.  It would upset commerce to the point that— I understand. I'm a little bit surprised that this issue hasn't arisen before, to be honest with you. I understand. It's a very interesting issue, a very interesting set of facts. What role do you think the—I don't know how you pronounce it. Your colleague said Smagen, I think, but Smagen, Smagen, Ygesian. What role, if any, does that case play in this case in your mind? None. Because—well, to the extent it helps highlight the fact dealing with intangible property, saying that a California judgment in that particular case, the court found that it was an intangible property. But if you look at the facts of that particular case, they're completely different here. In that particular case, the defendant attempted to thwart the plaintiff's ability to enforce that judgment in California. There was a lot of other activity. Remember, there was a series of other lawsuits that were filed or fraudulent documents that were filed in California. And so there was a lot more going on in California. And the courts—and, more importantly, and consistent with highlighting what the Smigel case said, is that the court in that case said, well, what the plaintiff, Smigel, did in this case, it's exactly what the court said it should do in the city of Almaty. And that is they went to China or they went to somewhere else. They got a judgment, and then they went to California in order to get a California judgment. And because the court said, well, look, a California judgment, it was in Russia. And the California judgment, it's only good in California. It's not good in Russia. So obviously this is the only place where they could enforce that particular. So you have an intangible asset, intangible property, a California judgment, and the only place, according to the Ninth Circuit in the Smigel case, the only place you're going to be able to enforce that is here in California and not in Russia. And then the opinion says, well, let me—you know, what the plaintiff in that case is exactly what we, the Ninth Circuit, instructed plaintiffs to do. And this, for instance, in the city of Almaty, which is a Kazakhstan case. And that is, go—you can get a judgment somewhere else. A lot of these claims, to the extent that the effect of the injury was felt in China, they could have filed a lawsuit in China, breach of contract, et cetera, got a judgment, and then come to California to convert it. I want to move you back to—you mentioned the Baskinon case, the Second Circuit case. So here's what they said regarding the money in the bank. The theft of bearish shares worth roughly $40 million from a safety deposit box, also in New York, was part of the allegation. Here's what they said. Because this property was located within the United States when it was stolen, we conclude that Baskinon has plausibly alleged a domestic injury, notwithstanding the fact that he is a citizen and resident of Chile. Help me understand how that doesn't lead us in the direction that this is a domestic injury. Right. And so what Baskinon also said, and it's very important, is that, remember, that was a motion to dismiss. And so the court said, look, at this point, in terms of a motion to dismiss, okay, this is enough, especially with the BCI shares. They're like, I know you took the share certificates. At this point, is there enough to put together a case? Sure. The difference is, here we had summary judgment. Here we had the evidence. We went through—there was evidence of there was no—all the effects were in China. I'm with you. If we adopt the effects test, I think the district court's correct. And the effects test—the problem with the effects test, to me, seems to be that that governs business injury. Business injury seems more associated with the effects test. But RICO specifically says injury to business or property. As to property, I don't think the effects test makes much sense as to property. The question is, was the property located in the United States? And there's no dispute that the property was located in the United States. The real question is, did the plaintiffs ever own the property in the United States? And it may be a technical argument, but the FOB clause seems to say they did. Well, let's say, for the sake of argument, because I don't have the FOB statement with me right now, that it was Global Master, China or a company or whatever, it was on that FOB. And then legally it may have taken possession of that property in Long Beach or wherever, San Pedro. The question here is that if the purpose of owning that—the next inquiry is, okay, now I own that property in San Pedro, Long Beach, but my intent was to move the property elsewhere. There was no other intent to then enjoy the benefits of that property in the United States. I understand the argument. I understand the argument. That's not enough. It would literally—in other words, if the court's like, well, I'm not sure. I mean, I know they're not going to enjoy the benefits of that property in the United States. The intention was clearly, undisputed, summary judgment, that the intent was to enjoy the benefits of that product, that property in China. Okay, so the fallback position, I think, is my understanding of reading the Supreme Court cases. Well, we must side on, quote, not ensuing international friction. We must side on limiting the territorial—the use of— I think if you were right about that, Bascuon would have come out differently. Do we have other questions? No, I'm good. All right. Well, I mean, I'm faceted by this subject. We don't want to delay your lunch, so why don't you finish. Well, if there's any other issue related to everything else— Thank you. I take it you disagree with your colleague. Yeah. I mean, I think I'm worried about this issue of the name incorporation. It's not really an issue in this appeal. I can explain it, but I'd rather answer any questions you have. Any questions? Well, you're almost out of time. I'll just be very clear. There's no question that the Chinese corporation is the party to the agreements and is the right plaintiff in this case. There was an argument about what the name of the company was, and we used one name in filing the case, and some of the documents use different names. This is because the Chinese company's name is in Chinese, and it's translated different ways into English. So if that's an issue, I'm glad to submit a briefing on it. I feel like it's not an issue, but I also feel like there was confusion that could have been created. Thank you very much, counsel. Thank you very much. Thank you both. The case just argued is submitted, and the court stands in adjournment for the day. All rise. This court for this session stands adjourned.
judges: SMITH, NELSON, UNKNOWN